# Exhibit 1

Filing # 113891162 E-Filed 09/24/2020 10:38:18 AM

IN THE CIRCUIT COURT FOR THE TWELFTH JUDICIAL CIRCUIT
IN AND FOR ORANGE COUNTY, FLORIDA
CIVIL DIVISION

**LEONARD LEON, MELISSA**
**MARLENE SANABIRA**
**RODRIGUEZ AND RAMON**
**SANTIAGO RODRIGUEZ**
**TORRES, MATTHEW PAUL**
**SCHWERI AND DURIA R.**
**RODRIGUEZ SCHWERI,**
**JAMIE HEINDL, AND**
**JEANNETTE ROTH,** *as*
*individuals and on behalf of those*
*similarly situated,*

     **Plaintiffs,**

v.

**DISNEY DESTINATIONS, LLC,**
**a Florida Limited Liability Company**

     **Defendant.**

_____/

**CLASS REPRESENTATION**

**CASE NO.**

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiffs, Melissa Marlene Sanabira Rodriguez and Ramon Santiago Rodriguez Torres (Mr. and Mrs. Rodriguez), Matthew Paul Schweri and Duria R. Rodriguez Schweri ("Mr. and Mrs. Schweri"), Leonard Leon ("Mr. Leon"), Jamie Heindl ("Ms. Heindl"), and Jeannette Roth ("Ms. Roth") (collectively, "Plaintiffs") by and through the undersigned counsel and on their own behalf and on behalf of those similarly situated (referred to generally as "the Class" or delineated into subclasses as identified herein), hereby file the following Class Action Complaint against Defendant, Disney Destinations, LLC ("Defendant"), and allege as follows:

7

## PRELIMINARY STATEMENT

1.    This is an action for violation of the Florida Unfair and Deceptive Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201 *et seq*., and for breach of contract. Claims for unjust enrichment are asserted in the alternative to each breach of contract Count.

## JURISDICTION AND VENUE

2.    This is an action for damages exceeding $30,000.00, exclusive of interest, attorneys' fees and court costs.

3.    Pursuant to Fla. Stat. § 26.012, and other applicable law, this Court has jurisdiction over each cause of action set forth herein.

4.    Venue is proper in this county pursuant to Fla. Stat. § 47.011 because the defendant resides in Orange County, because the cause of action accrued in Orange County, Florida, and because the Plaintiffs and Defendants have a signed agreement that states, in part, that any "dispute or legal action between you and us arising out of or in connection with this Contract shall be commenced and maintained exclusively in the Circuit Court in and for Orange County, Florida."

## PARTIES

5.    Mr. and Mrs. Rodriguez are husband and wife, and are individuals residing in Dade County, Florida, and are citizens of Florida.

6.    Mr. and Mrs. Schweri are husband and wife, and are individuals residing in Dade County, Florida, and are citizens of Florida.

7.    Mr. Leon is an individual residing in Hillsborough County, Florida, and is a citizen of Florida.

8.    Ms. Heindl is an individual residing in Flagler County, Florida, and is a citizen of Florida.

7

9.    Ms. Roth is an individual residing in Hillsborough County, Florida, and is a citizen of Florida.

10.    Defendant is a Florida Corporation with its principal place of business in Florida, and it conducted business within the State of Florida, including Orange County, during the periods relevant to this action.

11.    The conduct of Defendant was authorized, approved and/or ratified by one or more officers, directors, or managers of Defendant, and/or they knew in advance that the Defendant was likely to conduct itself, and allowed them to so act, with conscious disregard of the rights and safety of others. The agent(s) or employee(s) of Defendant acted within the course and scope of such agency or employment and acted with the consent, permission, and authorization of Defendant.

## CLASS REPRESENTATION ALLEGATIONS

12.    Plaintiffs bring this action as a class action, pursuant to Florida Rule of Civil Procedure 1.220(b)(3), on their own behalf and on behalf of all other similarly-situated consumers.

13.    Plaintiffs propose three classes related to the conduct described in this Complaint (the "Classes").

### OVERBILLING CLASS

14.    The "Over Billing Class" is comprised of:

   a.  All natural persons who purchased an annual pass to Defendant's Florida theme parks;
   b.  who funded the annual pass through Defendant's automatic monthly payment system with a debit card or bank account;
   c.  who were charged or had amounts held beyond what was authorized by contract;
   d.  on or after four years before the filing of this Complaint.

7

## DENIAL OF ACCESS CLASS

15.    The "Denial of Access Class" is comprised of:

a.    All natural persons who purchased an annual pass to Defendant's theme parks;
b.    who continue to be charged for access to the parks as was originally agreed;
c.    who are not able to access the parks and related services as advertised;
d.    on or after four years before the filing of this Complaint.

## DEFECTIVE CANCELLATION CLASS

16.    The "Defective Cancellation Class" is comprised of:

a.    All natural persons who purchased an annual pass to Defendant's Florida theme parks;
b.    who funded the annual pass through Defendant's automatic monthly payment system;
c.    who notified or attempted to notify Defendant they wished to cancel their pass on or after July 3, 2020;
d.    from whom Defendant collected a monthly payment after they notified Defendant of their desire to cancel their annual pass;
e.    on or after four years before the filing of this Complaint.

### *Numerosity*

17.    The Classes are each numerous that joinder of all members is impracticable. Plaintiffs estimate each of the Classes will have at least 25,000 members.

### *Commonality*

18.    There are questions of law and fact that are common to the Classes that predominate over questions affecting any individual class member. All class members held annual passes for Defendant's parks and were subject to the same policies and procedures. The common questions of law and fact relating to the Classes include, without limitation, whether Defendant violated FDUPTA, breached its contract with Plaintiffs, or in the alternative is liable for unjust enrichment through its conduct, which includes (a) overbilling or placing an impermissible hold on bank accounts, (b) denying annual passholders access to its parks on the terms promised, and (c)

continuing to bill consumers after consumers notified Defendant they wished to cancel their annual passes.

### *Typicality*

19.     Plaintiffs' claims are typical of the claims of the Classes, which are based on the same operative facts and share the same legal theories. Plaintiffs have no interest adverse or antagonistic to the interests of other class members.

### *Adequacy of Class Representation*

20.     Plaintiffs will fairly and adequately protect the interests of the Classes.  Plaintiffs have retained experienced counsel, competent in prosecuting class action litigation.

### *Predominance of Common Questions*

21.     The common questions described in Paragraph 18 predominate over any individual issues.

### *Superiority of Class Resolution*

22.     A class action is superior to other methods to fairly and efficiently adjudicate these Plaintiffs' claims.  Plaintiffs do not anticipate any unusual difficulties in managing the class action because the claims are based on Defendant's standard conduct patterns.

23.     A class action will permit many similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would create.

24.     Class treatment will allow the Court to adjudicate relatively small claims by many class members who could not otherwise afford to seek legal remedies for Defendant's conduct.

25.     Without a class action, Defendant will continue to violate the class members' rights and the class members will continue to suffer the loss of their legal rights, as well as monetary damages.

26.     Defendant's actions apply generally to the entirety of the Classes and, accordingly, Plaintiffs seek relief that is appropriate for those Classes.

## FACTS RELEVANT TO ALL CLASS REPRESENTATIVES

27.     Defendant operates theme parks around the world, including in Florida. Defendant offers consumers who wish to purchase annual passes to any of its parks an option to pay for the passes by providing a credit card, debit card, or bank account information. Defendant represented to the public and the Plaintiffs that the purchase of annual passes would provide passholders broad and guaranteed access to Defendant's parks to use as they chose with only specified restrictions such as pre-disclosed blackout dates.

28.     If a passholder elects to pay for all or part of his or her annual pass in monthly installments, Defendant automatically debits each installment from the consumer's credit card, debit card, or bank account monthly. Some passholders choose to pay a large down payment to have a favorable impact on their monthly payment.

29.     The annual passholders give specific authorization to Defendant regarding these monthly automatic charges. That authorization specifies an amount that can be collected. No additional authority exists to for Defendant to collect amounts above the amount specified in the agreements between Defendant and annual passholders.

30.     In March 2020, Defendant closed its parks due to the COVID-19 pandemic.

31.     Due to closing its parks, Defendant suspended the monthly auto-payments until the parks could reopen and extended passholders' annual passes for the length of time the parks were shut down.

32.     Upon determining that parks would reopen in July 2020, Defendant began the process of starting the auto-payments described above.  However, in approximately the first few days of July, annual passholders were shockingly and suddenly charged or had holds placed on their funds placed by Defendant in an amount more than their agreed monthly payment.

33.     The amounts charged or placed on hold in annual passholders' bank accounts exceeded any authority given to Defendant to take an auto-payment.  This caused harm to annual passholders who were wrongly and unexpectedly deprived of their assets and was a direct breach of the contract between Defendant and annual passholders.

34.     Upon reopening, the broad access to Defendant's parks previously given to annual passholders has been severely restricted.  Instead of the previously disclosed restrictions, such as blackout dates, annual passholders now have no guaranteed access to Defendant's parks, must make a reservation in order to utilize their annual passes, and are restricted to visiting one park per day.  Previously, passholders could visit multiple Disney theme parks in the same day, which is especially attractive to Florida residents due to their proximity to the parks.

35.     Defendant has conceded that there will be a "limited capacity period" where "it may be difficult for Annual Passholders to get park reservations."  Also, Defendant has conceded that certain "pass benefits and features will not be available" and that "park experiences and offering will be modified and subject to limited availability or even closure."

7

36.    Instead of doing its best to abide by its existing obligations to annual passholders, Defendant intentionally prioritized non-annual passholders for access to its parks. By limiting annual passholders' access, Defendant was taking advantage of the additional admission fees it collected from non-passholders while simultaneously collecting money from annual passholders who were deprived of access. Using its new, mandatory reservation system, Disney intentionally prioritized access to the parks for non-passholders over passholders by making the parks more available to non-passholders. Indeed, there were entire weeks in Disney's reservation system where access to the parks for passholders was blocked, but was wide open for non-passholders. *See* Blog Mickey, "Disney World's Most Loyal Guests Find It Increasingly Difficult to Visit Theme Parks," August 5, 2020 (available at: https://blogmickey.com/2020/08/disney-worlds-most-loyal-guests-find-it-increasingly-difficult-to-visit-the-theme-parks/).

37.    In addition, Defendant's actions took into account its belief that non-passholders are more likely to spend money on merchandise and food than annual passholders, and that passholders can obtain those items at a discount. This profit-driven approach to how Defendant treated its most loyal customers, who had already paid for access to Defendant's parks, was misleading, unfair, and deceptive.

38.    Indeed, during an earnings call with Disney shareholders in August 2020, Disney CEO Bob Chapek admitted that non-passholders who "travel[] and stay[] for five to seven days" are "more valuable to the business than someone who comes in on an annual pass . . ."

39.    Defendant's attempts at mitigating the restricted access to its parks have been illusory.

40.    For example, Defendant offered only a brief window of time from July 14, 2020 to August 11, 2020, during which annual passholders could cancel their annual passes.

7

Passholders would then not have any payments owed after that date and would be entitled to a partial refund. However, Defendant made the process to accomplish this cancelation overly burdensome by making consumers wait on the phone for extended periods of time, up to multiple hours, to reach a customer service representative. Indeed, the cancellation process was called "nightmarish" by the Orlando Sentinel.

41.     Further, although passholders were required to contact Defendant by no later than August 11, 2020, to cancel their annual passes, and access to the park was cut off for passholders who did so by August 12, 2020, Defendant informed passholders their refunds will be held until mid- to late-September or later. Some or all of the passholders who notified Disney they wished to cancel their passes are still awaiting refunds as of the date of filing this complaint, up to several months after they notified Disney they wished to cancel their passes.

42.     Moreover, Defendant allegedly sent notice of the cancellation option by e-mail, but many passholders never received such an email. Many passholders therefore had no meaningful opportunity to cancel their passes and are stuck with far less than they bargained for.

43.     Further, while Disney has stated that those customers who were wrongfully billed are eligible to receive reimbursement of any overdraft fees, having to wait on hold on the telephone for up to hours to receive such reimbursement is infeasible and unfair to ask of customers, and, in reality, provides no meaningful relief at all. Indeed, it compounds the problem through additional frustration and wasted time.

44.     Some consumers who waited for hours to inform Defendant that they wished to cancel their annual passes even had payments collected by Defendant after notifying Defendant of their wish to cancel, as detailed below.

7

## MR. AND MRS. RODRIGUEZ

45.    Mr. and Mrs. Rodriguez first purchased an annual pass in or around May 2019. They later timely renewed their annual pass in or around April 2020.

46.    Their annual pass had limited blackout dates for approximately 2 weeks in December and approximately and 2 weeks around March or April.  Otherwise, Mr. and Mrs. Rodriguez's access to Defendant's parks was guaranteed if the park had not met maximum capacity as that capacity was determined at the time of entering the contract.  Mr. and Mrs. Rodriguez's annual pass allowed them to access multiple parks, including in a single day, with no reservation required.

47.    On or about May of 2019, Mr. and Mrs. Rodriguez purchased their annual passes, paid a down payment, and agreed to pay additional payments of approximately $170.00 per month for 12 months via automatic debit.  Around April of 2020, Mr. and Mrs. Rodriguez renewed their annual passes and were able to maintain the same monthly payment.

48.    The automatic debit for Mr. and Mrs. Rodriguez's monthly payments was drawn on a checking account via debit card.

49.    Around the beginning of July, Defendant suddenly and wrongfully debited or placed a hold on Mr. and Mrs. Rodriguez's bank account for approximately $346.00, amounting to over two months of agreed payments.

50.    This sudden, unexpected, and unauthorized reduction in Mr. and Mrs. Rodriguez's access to their funds caused stress and aggravation.  For instance, because of Defendant's actions, Mr. and Mrs. Rodriguez had to defer making a car payment.

51.    In addition to the improper debiting or holds relating to their funds, Mr. and Mrs. Rodriguez have invested in annual passes that they cannot use as intended.  After paying a

significant down payment and monthly payments, Mr. and Mrs. Rodriguez are significantly invested in the annual pass agreement with Defendant. As a result of Defendant's restrictions, they will not be able to utilize their annual pass as Defendant agreed in their contract.

## MR. AND MRS. SCHWERI

52.     Mr. and Mrs. Schweri first purchased their annual pass in late 2019. At the time, their goal for use of the pass was to have monthly access to Defendant's parks.

53.     Their annual pass had limited blackout dates for approximately three weeks in December and approximately two weeks in April. Otherwise, Mr. and Mrs. Schweri's access to Defendant's parks was guaranteed if the park had not met maximum capacity as that capacity was determined at the time of entering the contract. Mr. and Mrs. Schweri's annual pass allowed them access to multiple parks in one day with no reservations required.

54.     On or about October or November of 2019, Mr. and Mrs. Schweri purchased their annual passes and paid approximately $800.00 as a down payment and agreed to pay additional payments of $170.00 per month for 12 months via automatic debit.

55.     The automatic debit for Mr. and Mrs. Schweri's payment was drawn on a bank account via debit card.

56.     Around the beginning of July, Defendant suddenly and wrongfully debited or placed a hold on Mr. and Mrs. Schweri's bank account for approximately $803.00, amounting to over four months of agreed payments.

57.     This sudden, unexpected, and unauthorized reduction in access to their funds caused stress and aggravation. Mrs. Schweri was frantic about the lost funds and Defendant's actions caused the Schweris extreme financial hardship. For instance, because of the depravation of use of their funds, two separate bills owed to third parties required emergency deferment or

7

intervention. Defendant's action caused a third-party's automatic debit to be denied for insufficient funds and Mr. and Mrs. Schweri had to pay an overdraft fee.

58.     In addition to the improper action regarding their debit card, Mr. and Mrs. Schweri have invested in annual passes that they cannot use as intended. After paying a significant down payment and several months' payments, Mr. and Mrs. Schweri are significantly invested in the annual pass agreement with Defendant. As a result of Defendant's restrictions, they will not be able to utilize their annual pass as Defendant agreed in their contract.

## MR. LEON

59.     Mr. Leon first purchased his annual pass around November of 2019.

60.     His annual pass had limited blackout dates for approximately three weeks in December and approximately two weeks in around April. Otherwise, Mr. Leon's access to Defendant's parks was guaranteed if the park had not met maximum capacity as that capacity was determined at the time of entering the contract. Mr. Leon's annual pass allowed for access to multiple parks with no reservations required.

61.     In 2013 or 2014, Mr. Leon first purchased his annual passes by paying approximately $600.00 as a down payment and agreeing to pay additional payments of approximately $150.00 per month. The annual pass contracts have been renewed in the years since.

62.     The automatic debit was drawn on Mr. Leon's checking account via debit card.

63.     Around the beginning of July, Defendant suddenly and wrongfully debited or placed a hold on Mr. Leon's bank account for approximately $637.00, amounting to approximately four months of agreed payments.

64.    This sudden, unexpected, and unauthorized reduction in access to Mr. Leon's funds caused stress and aggravation. Mr. Leon and his wife had not planned on this large expense. The stress was increased because of another large expense that had occurred on the same day.

65.    In addition to the improper actions concerning his debit card, Mr. Leon has invested in an annual pass that he cannot use as intended. After paying a significant down payment and making monthly payments, Mr. Leon is significantly invested in the annual pass agreement with Defendant. As a result of Defendant's restrictions, he will not be able to utilize their annual pass as Defendant agreed in their contract.

## MS. HEINDL

65.    Ms. Heindl first purchased an annual pass to Defendant's theme parks in or around April 2018.

66.    On April 23, 2019, Ms. Heindl renewed the annual pass, made an additional down payment towards those passes, and agreed to additional monthly payments toward the cost of those passes.

67.    Ms. Heindl did not thereafter renew the annual passes. The annual passes were scheduled to expire on April 22, 2020, had the Florida Disney theme parks not shut down due to the COVID-19 pandemic and Defendant accordingly extended the expiration of annual passes for the duration of the shutdown. Ms. Heindl had a single payment that remained due at the time of the shutdown.

69.    On or around July 3, 2020, Defendant suddenly and wrongfully debited or placed a hold on funds in Ms. Heindl's bank account in the amount of $225.78 without authorization. That amount is the same amount as Ms. Heindl's typical monthly payment for her annual passes but was not on the regularly scheduled payment date.

7

70.    After the July 3, 2020, change, Ms. Heindl called Defendant's customer service department and spoke to customer service representative who informed Ms. Heindl that the charge was made in error and that Ms. Heindl would be reimbursed. The cast member falsely told her that her annual passes were already expired and that she would not be charged any further amounts for them.

71.    Approximately ten days later, on or about July 13, 2020, Defendant once again charged Ms. Heindl's debit card $225.78.

72.    Ms. Heindl again called Defendant's customer service line, but after an hour of waiting on hold, she gave up and instead used the online chat feature on Defendant's website. She was connected to a Disney customer service representative who provided her further inaccurate information, including that she could expect another charge for her annual passes in August 2020 that would subsequently be reimbursed in September 2020 or October 2020. Ms. Heindl had additional communications through the online chat feature on Defendant's website on July 27, 2020, and July 28, 2020, in which she was again provided inaccurate information.

73.    Because Disney's customer service representatives repeatedly told her she could expect additional charges in August for her annual passes, Ms. Heindl believed it was necessary to contact her bank to block such unauthorized charges, and expended considerable time and effort in doing so.

74.    This sudden, unexpected, and unauthorized reduction in Ms. Heindl's funds has caused stress and aggravation. Ms. Heindl had to waste time and energy because of Defendant's unauthorized charges and inaccurate information. She has repeatedly spent hours on hold waiting to speak to Defendant's customer service representatives and has had numerous online chat conversations with Defendant's customer service representatives, only to be provided incorrect

information in these communications. Moreover, Ms. Heindl has had to spend hours dealing with her bank, including writing a letter detailing the previous unauthorized charge and anticipated future unauthorized charges in an effort to block future charges. In addition, Ms. Heindl had to transfer money from her savings account in order to pay other bills due to Defendant's unauthorized withdrawal or hold on her funds.

75.    Further, as an annual passholder, Ms. Heindl was subject to the same denial of access to the parks as other annual passholders until her pass expired.

## MS. ROTH

76.    Ms. Roth obtained her annual pass around March of 2020.

77.    Ms. Roth's annual pass had limited blackout dates that were specified by Defendant at the time of her agreeing to the terms of the annual passholder agreement. Otherwise, Ms. Roth's access to Defendant's parks was guaranteed if the park had not met maximum capacity as that capacity was determined at the time of entering the contract. Ms. Roth's annual pass allowed for access to multiple parks in a day with no reservations required.

78.    As part of her annual passholder agreement with Defendant, Ms. Roth agreed to make her monthly payment by having Defendant automatically charge her credit card monthly.

79.    Ms. Roth purchased her annual pass with the intention of using it in August of 2020 because that was when she anticipated long-distance visitors would be coming to the area and she wanted to enjoy Defendant's parks with them.

80.    When the Defendant re-opened its parks, Defendant offered to allow annual passholders to cancel their memberships. If a passholder chose to cancel, Defendant represented that no additional fees would be charged on the consumer's account after August 11, 2020.

7

81.     Ms. Roth attempted to accept Defendant's offer to cancel, despite significant barriers to doing so.

82.     Ms. Roth contacted Defendant in an attempt to cancel her account on July 17, 2020. At the time she called, it was a three hour wait to reach Defendant's representatives. As a result of this long wait, Ms. Roth was unable to focus on her work which involves making sales calls over the telephone.

83.     Ms. Roth's July 17, 2020, phone call began at 12:50 p.m., and she was not connected with a representative until around 4:00 p.m. When Ms. Roth was finally able to speak to one of Defendant's customer service representatives, Defendant's agent represented to Ms. Roth that the cancelation had been processed and that Ms. Roth would receive an email within 48 hours. No such email came.

84.     Approximately one week after the first phone call, Ms. Roth called Defendant because she had not received the promised email. Ms. Roth again waited on hold before being connected to a customer service representative. During this second call, Defendant's representative confirmed that the account had been canceled. Oddly, that representative told Ms. Roth that despite her cancelation, she would still be billed for August, but that the funds would be refunded in November. Ms. Roth never agreed to this additional charge.

85.     Despite Defendant's public representations and representations to Ms. Roth, Ms. Roth was billed after her cancelation. In fact, as of the date of filing this lawsuit, her most recent charge was September 2, 2020 for $34.59.

86.     Ms. Roth called Defendant the day after the September 2, 2020 charge. Defendant acknowledged that the charge was improper.

7

87.    As a result of Defendant's improper billing in contradiction with its public representations, Ms. Roth has been harmed due to the loss of her funds.

**FIRST CLAIM FOR RELIEF**
**FDUTPA**
**(OVERBILLING CLASS)**

88.    Plaintiffs and Overbilling Class members incorporate by reference paragraphs 1 through 87 of this Class Complaint as through stated fully herein.

89.    This count is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. 501.201 *et seq.*

90.    At all times material hereto, Plaintiffs and all members of the Overbilling Class were consumers within the meaning of Fla. Stat. § 501.203 and are entitled to relief in accordance with Fla. Stat. § 501.211.

91.    At all times material hereto, Defendant conducted trade and commerce within the meaning of Fla. Stat. § 501.203.

92.    Defendant intentionally engaged in unconscionable acts and practices, and unfair or deceptive acts or practices during trade and commerce in Florida as detailed above. Specifically, Defendant charged or held Plaintiffs' and Overbilling Class members funds in an amount beyond what Defendant was authorized to charge or hold.

93.    As a direct and proximate result of Defendants FDUTPA violations, Plaintiffs and the Overbilling Class members suffered loss of use regarding those funds, overdraft fees, financial stress, and actual financial harm in an amount to be proven at trial. As a result of Defendant's FDUTPA violations, Plaintiffs and Overbilling Class members have out-of-pocket losses for which they are entitled to damages.

7

94.     All conditions precedent to this action have occurred, been satisfied, or been waived.

95.     Plaintiffs have retained the undersigned attorneys to represent them in this action, and they are obligated to pay a reasonable fee for such services.

96.     Plaintiffs and the Overbilling Class members are entitled to actual damages and attorneys' fees pursuant to Fla. Stat. § 501.2105.

WHEREFORE, Plaintiffs and the Overbilling Class request that this Court enter a judgment in their favor (1) granting certification of this matter to proceed as a class action; (2) finding that Defendant has violated FDUTPA; and (3) awarding actual damages, statutory damages, attorneys' fees and costs, together with any and all such further relief as is deemed necessary or appropriate.

### SECOND CLAIM FOR RELIEF
### FDUTPA
### (DENIAL OF ACCESS CLASS)

97.     Plaintiffs and Denial of Access Class members incorporate and reference paragraphs 1 through 87 of this Class Complaint as through stated fully herein.

98.     This count is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. 501.201 *et seq.*

99.     At all times material hereto, Plaintiffs and all members of the Denial of Access Class were consumers within the meaning of Fla. Stat. § 501.203 and are entitled to relief in accordance with Fla. Stat. § 501.211.

100.    At all times material hereto, Defendant conducted trade and commerce within the meaning of Fla. Stat. § 501.203.

101.    Defendant intentionally engaged in unconscionable acts and practices, and unfair or deceptive acts or practices during trade and commerce in Florida as detailed above. Specifically, Defendant failed to provide annual passholders with access to the parks as was promised. Instead, Defendant knowingly and intentionally prioritized non-annual passholders to the detriment of annual passholders.

102.    Further, Defendant created barriers that hindered many Denial of Access Class members from cancelling their passes, including the short time frame passholders were provided to cancel passes, lengthy wait times of up to several hours to speak to one of Defendants' customer service representatives, and the absence of a method to cancel annual passes online unless the passholder received an email containing a cancellation link, which many passholders did not receive.

103.    As a direct and proximate result of Defendants FDUTPA violations, Plaintiffs and the Denial of Access Class members suffered loss of the funds they paid to use Defendant's parks and actual financial harm in an amount to be proven at trial. As a result of Defendant's FDUTPA violations, Plaintiffs and FDUTPA Denial of Access Class members have out-of-pocket losses for which they are entitled to damages.

104.    All conditions precedent to this action have occurred, been satisfied, or been waived.

105.    Plaintiffs have retained the undersigned attorneys to represent them in this action, and they are obligated to pay a reasonable fee for such services.

106.    Plaintiffs and the Denial of Access Class members are entitled to actual damages, and attorneys' fees pursuant to Fla. Stat. § 501.2105.

WHEREFORE, Plaintiffs and the Denial of Access Class request that this Court enter a judgment in their favor (1) granting certification of this matter to proceed as a class action; (2) finding that Defendant has violated FDUTPA; and (3) awarding actual damages, statutory damages, attorneys' fees and costs, together with any and all such further relief as is deemed necessary or appropriate.

### THIRD CLAIM FOR RELIEF
### FDUTPA
### (DEFECTIVE CANCELATION CLASS)

107.    Plaintiffs and Defective Cancelation Class members incorporate and reference paragraphs 1 through 87 of this Class Complaint as through stated fully herein.

108.    This count is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. 501.201 *et seq.*

109.    At all times material hereto, Plaintiffs and all members of the Defective Cancelation Class were consumers within the meaning of Fla. Stat. § 501.203 and are entitled to relief in accordance with Fla. Stat. § 501.211.

110.    At all times material hereto, Defendant conducted trade and commerce within the meaning of Fla. Stat. § 501.203.

111.    Defendant intentionally engaged in unconscionable acts and practices, and unfair or deceptive acts or practices during trade and commerce in Florida as detailed above. Specifically, Defendant purported to offer Plaintiffs and Defective Cancelation Class members the opportunity to cancel their annual passholder agreement so that no additional fees would accrue or be charged. Instead, Defendant established a system that did not provide reasonable access by phone or online for Plaintiffs or Class members to cancel their agreements. Even when Plaintiffs or Class members

7

successfully informed Defendant that they wanted to cancel their annual passholder memberships, Defendant continued to bill and charge Plaintiffs and Class members for the canceled passes.

112.   As a direct and proximate result of Defendants FDUTPA violations, Plaintiffs and the Defective Cancelation Class members suffered loss of use regarding those funds, financial stress, loss of time, and actual financial harm in an amount to be proven at trial. As a result of Defendant's FDUTPA violations, Plaintiffs and Defective Cancelation Class members have out-of-pocket losses for which they are entitled to damages.

113.   All conditions precedent to this action have occurred, been satisfied, or been waived.

114.   Plaintiffs have retained the undersigned attorneys to represent them in this action, and they are obligated to pay a reasonable fee for such services.

115.   Plaintiffs and the Defective Cancelation Class members are entitled to actual damages, and attorneys' fees pursuant to Fla. Stat. § 501.2105.

WHEREFORE, Plaintiffs and the Defective Cancelation Class request that this Court enter a judgment in their favor (1) granting certification of this matter to proceed as a class action; (2) finding that Defendant has violated FDUTPA; and (3) awarding actual damages, statutory damages, attorneys' fees and costs, together with any and all such further relief as is deemed necessary or appropriate.

## FOURTH CLAIM FOR RELIEF - BREACH OF CONTRACT
## (OVERBILLING CLASS)

116.   Plaintiffs and the Overbilling Class members incorporate by reference paragraphs 1 through 87 of this Class Complaint as though stated fully herein.

117.   Plaintiffs and the Overbilling Class members entered into contracts with the Defendant for an annual pass.

118.    Defendant charged or held funds belonging to Plaintiffs and the Overbilling Class members in amounts Defendant had no contractual right nor authorization to charge or hold. By charging or holding Plaintiffs and the Class members funds beyond what was authorized, Defendant breached its contract.

119.    Plaintiffs and the Overbilling Class members have performed all, or substantially all, of the obligations imposed on them under the contract with Defendant.

120.    Plaintiffs and the Overbilling Class members have sustained damages because of Defendant's breach of contract. Even if the funds were later refunded or released, Plaintiffs and class members were deprived of their funds and suffered economic hardship and mental anguish.

WHEREFORE, Plaintiffs and the Overbilling Class request that the Court enter Judgment in their favor for: (1) Certification of this matter to proceed as a class action; (2) actual damages in an amount according to proof; and (3) such other and further relief as the Court deems just and proper.

## FIFTH CLAIM FOR RELIEF - BREACH OF CONTRACT (DENIAL OF ACCESS CLASS)

121.    Plaintiffs and the Denial of Access Class members incorporate by reference paragraphs 1 through 87 of this Class Complaint as though stated fully herein.

122.    Plaintiffs and the Denial of Access Class members provided Defendant with a benefit in exchange for Defendant providing an annual pass that gave passholders access to Defendant's parks on specific terms.

123.    Defendant has unilaterally altered the access that annual passholders contemplated at the time of signing the contract. This is a material breach of the terms of the contract between Defendant and annual passholders.

7

124.    Plaintiffs and the Denial of Access Class members have performed all, or substantially all, of the obligations imposed on them under the contract with Defendant.

125.    Plaintiffs and the Denial of Access Class members have sustained damages because of Defendant's breach of contract. Even if the Defendant later restores passholder access to the originally contemplated terms, Plaintiffs and Denial of Access Class members were deprived for a substantial amount of time of the access for which they paid.

126.    Further, Defendant created barriers that hindered many Denial of Access Class members from cancelling their passes, including the short time frame passholders were provided to cancel passes, lengthy wait times of up to several hours to speak to one of Defendants' customer service representatives, and the absence of a method to cancel annual passes online unless the passholder received an email containing a cancellation link, which many passholders did not receive.

WHEREFORE, Plaintiffs and the Denial of Access Class request that the Court enter Judgment in their favor for:  (1) certification of this matter to proceed as a class action; (2) actual damages in an amount according to proof; and (3) such other and further relief as the Court deems just and proper.

## SIXTH CLAIM FOR RELIEF (*IN THE ALTERNATIVE*)
## UNJUST ENRICHMENT
## (DENIAL OF ACCESS CLASS)

127.    Plaintiffs and the Class members incorporate by reference paragraphs 1 through 87 of this Class Complaint as though stated fully herein.

128.    Plaintiffs and the Class conferred a benefit on Defendant, specifically the money paid to have access to Defendant's parks on specific terms.

129.    Defendant had knowledge of those transactions and accepted and retained the monetary benefit conferred under circumstances that are inequitable and unjust considering the retention of the benefit without Defendant providing the expected access to its parks.

130.    Further, Defendant created barriers that hindered many Denial of Access Class members from cancelling their passes, including the short time frame passholders were provided to cancel passes, lengthy wait times of up to several hours to speak to one of Defendants' customer service representatives, and the absence of a method to cancel annual passes online unless the passholder received an email containing a cancellation link, which many passholders did not receive.

131.    As a result, Plaintiffs and members of the Denial of Access Class have suffered monetary damages.

WHEREFORE, Plaintiffs and the Denial of Access Class request that the Court enter Judgment in their favor for:  (1) certification of this matter to proceed as a class action; (2) actual damages in an amount according to proof; and (3)  such other and further relief as the Court deems just and proper.

## SEVENTH CLAIM FOR RELIEF - BREACH OF CONTRACT
## (DEFECTIVE CANCELATION CLASS)

132.    Plaintiffs and the Defective Cancelation Class members incorporate by reference paragraphs 1 through 87 of this Class Complaint as though stated fully herein.

133.    Plaintiffs and the Defective Cancelation Class members entered into contracts with the Defendant for an annual pass.

134.    Defendant recognized that it was unilaterally breaching the original agreement held with annual passholders.  In contemplation of this unilateral breach, Defendant offered to

7

modify the annual passholder agreement so that passholders could cancel the agreement with no charges after August 11, 2020.

135.    Plaintiffs and the Defective Cancelation Class members have performed all, or substantially all, of the obligations imposed on them to accept the terms Defendant made under the offer to cancel.

136.    Plaintiffs and the Defective Cancelation Class members have sustained damages because of Defendant's breach of contract due to its continued collection of payments from passholders who notified Defendant they wished to cancel their contract. Even if the overbilled funds were later refunded, Plaintiffs and class members were deprived of their funds and suffered economic hardship and mental anguish.

WHEREFORE, Plaintiffs and the Defective Cancelation Class request that the Court enter Judgment in their favor for: (1) certification of this matter to proceed as a class action; (2) actual damages in an amount according to proof; and (3) such other and further relief as the Court deems just and proper.

### EIGHTH CLAIM FOR RELIEF (*IN THE ALTERNATIVE*)
### UNJUST ENRICHMENT
### (DEFECTIVE CANCELATION CLASS)

137.    Plaintiffs and the Defective Cancelation Class members incorporate by reference paragraphs 1 through 87 of this Class Complaint as though stated fully herein.

138.    Plaintiffs and the Defective Cancelation Class conferred a benefit on Defendant, specifically the money that Defendant improperly collected after annual passholders notified Defendant they wished to cancel their annual passes.

139.    Defendant had knowledge of those transactions and accepted and retained the monetary benefit conferred under circumstances that are inequitable and unjust in light of the

7

retention of the benefit when Defective Cancellation Class members had notified Defendant of their wish to cancel their passes.

140.    As a result, Plaintiffs and members of the Defective Cancellation Class have suffered monetary damages.

WHEREFORE, Plaintiffs and the Class request that the Court enter Judgment in their favor for: (1) certification of this matter to proceed as a class action; (2) actual damages in an amount according to proof; and (3) such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby respectfully demands a trial by jury. U.S. Const. Amend. 7 and Fla. R. Civ. Pro. 1.430.

Dated: September 24, 2020

Respectfully Submitted,

**KYNES, MARKMAN & FELMAN, P.A.**
P.O. Box 3396
Tampa, Florida 33601
Phone:  (813) 229-1118
Fax:     (813) 221-6750

/s/ Katherine E. Yanes
**KATHERINE EARLE YANES, ESQ.**
Florida Bar. No. 658464
e-mail: kyanes@kmf-law.com
**GUS M. CENTRONE, ESQ.**
Florida Bar No. 30151
e-mail: gcentrone@kmf-law.com

**CHRISTIE D. ARKOVICH, P.A.**
1520 W Cleveland St.
Tampa, FL 33606-1807
Phone: (813) 258-2808
Fax: (813) 258-5911

/s/ Christie D. Arkovich
**CHRISTIE D. ARKOVICH**
Florida Bar No. 963690
e-mail: christie@christiearkovich.com
Co-Counsel for Plaintiffs

**SHRADER LAW, PLLC**
612 W. Bay Street
Tampa, Florida 33606
Phone: (813) 360-1529
Fax:     (813) 336-0832

/s/ Brian L. Shrader
**BRIAN L. SHRADER, ESQ.**
Florida Bar No. 57251
e-mail: bshrader@shraderlawfirm.com

7